******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

LEONARDO NOGUEIRA *v.* COMMISSIONER
OF CORRECTION
(AC 38119)

DiPentima, C. J., and Mullins and Flynn, Js.

*Argued April 13—officially released October 11, 2016*

(Appeal from Superior Court, judicial district of
Tolland, Cobb, J.)

*Sarah Hanna*, assistant state's attorney, with whom,
on the brief, were *Stephen J. Sedensky III*, state's attor-
ney, and *Jo Anne Sulik*, supervisory assistant state's
attorney, for the appellant (respondent).

*Michael W. Brown*, for the appellee (petitioner).

*Opinion*

DiPENTIMA, C. J. The respondent, the Commissioner of Correction, appeals from the judgment of the habeas court granting the petition for a writ of habeas corpus filed by the petitioner, Leonardo Nogueira. On appeal, the issue before this court is whether the habeas court properly determined that the respondent had failed to establish, beyond a reasonable doubt, that the result in the petitioner's 2002 criminal trial for kidnapping in the first degree would have been the same had the criminal trial court applied the interpretation of kidnapping subsequently adopted by our Supreme Court in *State* v. *Salamon*, 287 Conn. 509, 949 A.2d 1092 (2008).[1] We disagree with the conclusion of the habeas court, and, accordingly, reverse the judgment granting the petition for a writ of habeas corpus.

The following facts and procedural history are relevant to our discussion. Following a trial to the court, the petitioner was convicted of kidnapping in the first degree in violation of General Statutes § 53a-92 (a) (2) (A), sexual assault in the first degree in violation of General Statutes § 53a-70 (a) (1), attempt to commit sexual assault in the first degree in violation of General Statutes §§ 53a-70 (a) (1) and 53a-49 (a) (2), assault in the third degree in violation of General Statutes § 53a-61 (a) (1) and threatening in violation of General Statutes (Rev. to 1999) § 53a-62 (a) (1). *State* v. *Nogueira*, 84 Conn. App. 819, 820, 856 A.2d 423 (2004), cert. denied, 273 Conn. 927, 873 A.2d 1000 (2005). Following the petitioner's conviction, the court, *White, J.*, sentenced him to thirty-five years incarceration. Id., 822.

These criminal charges stemmed from an incident that occurred on November 11, 2000, in Danbury when the victim was attacked by the petitioner at approximately 9 p.m. Id., 821. The petitioner grabbed the legs of the victim, dragged her along the sidewalk and forced her into a window well where he sexually assaulted her for two hours. Id. The victim escaped from the window well and fled from the petitioner, who pursued her. Id. She grabbed onto a telephone pole, but the petitioner strangled her, causing her to loosen her grip. Id. He then hauled her between two houses, and kept her in that location for a period of five to ten minutes. The petitioner absconded upon the arrival of the police. Id.[2] We affirmed the judgment of conviction on direct appeal. Id., 826.

Following his conviction and direct appeal, our Supreme Court "issued two watershed decisions pertaining to kidnapping crimes, *State* v. *Salamon*, [supra, 287 Conn. 509], and *Luurtsema* v. *Commissioner of Correction*, 299 Conn. 740, 12 A.3d 817 (2011)." *Wilcox* v. *Commissioner of Correction*, 162 Conn. App. 730, 736, 129 A.3d 796 (2016). Stated succinctly, "[p]ursant to the holdings of these decisions, a defendant who has

been convicted of kidnapping may collaterally attack his kidnapping conviction on the ground that the trial court's jury instructions failed to require that the jury find that the defendant's confinement or movement of the victim was not merely incidental to the defendant's commission of some other crime or crimes." Id.[3]

The petitioner filed a petition for a writ of habeas corpus alleging ineffective assistance of both his trial and appellate counsel. Following a habeas trial, the court, *Nazzaro, J.*, issued a memorandum of decision denying the petition. *Nogueira* v. *Warden*, Superior Court, judicial district of Tolland, Docket No. CV-06-4001062, 2011 WL 3890968 (July 22, 2011).[4] The habeas court then denied certification to appeal. We subsequently dismissed the petitioner's appeal. *Nogueira* v. *Commissioner of Correction*, 142 Conn. App. 906, 64 A.3d 1289, cert. denied, 309 Conn. App. 902, 68 A.3d 657 (2013).

The petitioner commenced a second habeas action and filed an amended petition for a writ of habeas corpus on April 8, 2015. In count one, the petitioner alleged that his conviction of kidnapping in the first degree violated his right to due process because there was no specific finding by Judge White in his criminal trial that he had intended to prevent the victim's liberation for a longer period of time than was necessary to commit the crime of sexual assault in the first degree. In counts two and three, the petitioner alleged ineffective assistance of his first habeas counsel and his appellate habeas counsel.[5] The respondent filed an answer and raised the affirmative defense of procedural default as to count one. The petitioner filed a response, arguing that (1) he was not procedurally defaulted and (2) in the alternative, if count one of the petition was subject to a procedural default, then he satisfied the cause and prejudice requirement.

At the habeas trial on May 27, 2015, the parties agreed that the court should consider the "criminal trial transcripts, direct appeal materials, first habeas trial transcripts, and pleadings and the habeas appeal materials as well." Additionally, the parties agreed that no additional testimony was necessary. Counsel for the petitioner explained that because the petitioner's conviction occurred in a trial to the court, rather than a jury, his claim was not a jury instruction issue, but rather a "*Salamon* fact-finding issue."

On June 10, 2015, the court, *Cobb, J.*, issued its memorandum of decision, concluding that the petitioner's constitutional right to due process was violated as a result of the criminal court's failure to apply the *Salamon* standard for kidnapping that was made retroactive to habeas proceedings in *Luurtsema* v. *Commissioner of Correction*, supra, 299 Conn. 740. The habeas court granted the petition for a writ of habeas corpus, vacated the petitioner's conviction of kidnapping and remanded

the case to the criminal trial court for a new trial on the kidnapping charge.

The habeas court stated the petitioner's claim as follows: "[H]is rights to due process of law pursuant to the fourteenth amendment to the United States constitution and article first, §§ 8 and 9, of the Connecticut constitution were violated because he was convicted of kidnapping absent a finding by the fact finder, in this case the [criminal] trial court, that the victim was restrained to an extent exceeding that which was necessary to accomplish or complete the crime of sexual assault, and other crimes, as now required by *State* v. *Salamon*, supra, 287 Conn. 509."

The habeas court stated that it was undisputed in the present case that Judge White, in 2002, had not applied the *Salamon* standard, which was not part of our law until 2008, in finding the petitioner guilty of kidnapping in the first degree. "In particular, the [criminal] trial court did not consider whether the petitioner intended to move or confine the victim in a way that had independent criminal significance, that is, that the victim was restrained to an extent exceeding that which was necessary to accomplish or complete the other crime, in this case the sexual assaults and other crimes." The habeas court, therefore, concluded that the petitioner had suffered a violation of his due process rights. It then rejected the respondent's affirmative defense of procedural default.[6] For a remedy, it followed *Luurtsema* v. *Commissioner of Correction*, supra, 299 Conn. 740, and ordered that the case be returned to the criminal trial court for a new trial on the charge of kidnapping in the first degree. On June 22, 2015, the respondent filed a petition for certification to appeal, which the habeas court granted. This appeal followed. Additional facts will be set forth as necessary.

After this court heard oral argument in the present case, our Supreme Court released its decision in *Hinds* v. *Commissioner of Correction*, 321 Conn. 56, 136 A.3d 596 (2016). That decision contains a historical review of the changes to our kidnapping law and establishes the proper test for determining whether the failure to apply the *Salamon* standard constituted harmless error. Accordingly, a detailed review of *Hinds* will facilitate our analysis of the respondent's appeal in the case before us.

In *Hinds*, the court began by noting that the hallmark of the crime of kidnapping "is an abduction, a term that is defined by incorporating and building upon the definition of restraint." Id., 66–67. It then turned to *State* v. *Chetcuti*, 173 Conn. 165, 170–71, 377 A.2d 263 (1977), in which the court had rejected the claim that if the abduction and restraint of a victim are merely incidental to another crime, that abduction and restraint cannot support a conviction of kidnapping. *Hinds* v. *Commissioner of Correction*, supra, 321 Conn. 67. "The court

pointed to the fact that our legislature had declined to merge the offense of kidnapping with sexual assault or with any other felony, as well as its clearly manifested intent in the kidnapping statutes not to impose any time requirement for the restraint or any distance requirement for the asportation." Id. Despite a number of challenges over the years, our Supreme Court consistently maintained that position with respect to the kidnapping statute. Id., 67–68.

In *State* v. *Salamon*, supra, 287 Conn. 509, however, our Supreme Court reexamined its interpretation of the crime of kidnapping, and reached a conclusion contrary to three decades of its prior holdings. *Hinds* v. *Commissioner of Correction*, supra, 321 Conn. 68. The court in *Salamon* explained: "Upon examination of the common law of kidnapping, the history and circumstances surrounding the promulgation of our current kidnapping statutes and the policy objectives animating those statutes, we now conclude the following: Our legislature, in replacing a single, broadly worded kidnapping provision with a gradated scheme that distinguishes kidnappings from unlawful restraints *by the presence of an intent to prevent a victim's liberation*, intended to exclude from the scope of the more serious crime of kidnapping and its accompanying severe penalties those confinements or movements of a victim that are *merely incidental to and necessary for* the commission of another crime against that victim. Stated otherwise, to commit a kidnapping in conjunction with another crime, a defendant must *intend* to prevent the victim's liberation for a longer period of time or to a greater degree than that which is necessary to commit the other crime." (Emphasis in original; internal quotation marks omitted.) Id., 68–69.

The court in *Hinds* then turned to *Luurtsema* v. *Commissioner of Correction*, supra, 299 Conn. 740, which had concluded "as a matter of state common law that policy considerations weighed in favor of retroactive application of *Salamon* to collateral attacks on judgments rendered final before that decision was issued." *Hinds* v. *Commissioner of Correction*, supra, 321 Conn. 69. With those principles in mind, the court addressed the issue of whether the petitioner's *Salamon* claim was subject to the doctrine of procedural default[7] as a result of his failure to challenge the kidnapping instruction at his criminal trial. Id., 70. Ultimately, our Supreme Court concluded that a *Salamon* claim, as raised by the petitioner, was not subject to procedural default. Id., 76.

The court proceeded to the question of whether the petitioner was entitled to a new trial as a result of the omission of the proper instruction on kidnapping pursuant to *Salamon*. Id. It determined that the proper test to apply was the harmless error standard applied on a direct appeal to a claim that an essential element

is absent from a jury instruction. Id., 76–77. "On direct appeal, [i]t is well established that a defect in a jury charge which raises a constitutional question is reversible error if it is reasonably possible that, considering the charge as a whole, the jury was misled. . . . [T]he test for determining whether a constitutional error is harmless . . . is whether it appears beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained. . . . A jury instruction that improperly omits an essential element from the charge constitutes harmless error [only] if a reviewing court concludes beyond a reasonable doubt that the omitted element was uncontested and supported by overwhelming evidence, such that the jury verdict would have been the same absent the error . . . . The failure to charge in accordance with *Salamon* is viewed as an omission of an essential element . . . and thus gives rise to constitutional error." (Citations omitted; internal quotation marks omitted.) Id., 77–78. Following a consideration of the factors set forth in *Salamon* as applied to the facts, the court in *Hinds* concluded that the omission of the required instruction was not harmless beyond a reasonable doubt. Id., 78–81.

Before considering the present case in light of the controlling principles set forth in *Hinds*, we address one characteristic distinguishing it from the majority of post-*Salamon* appellate cases. In this matter, the petitioner was convicted following a trial to the court, whereas most of the post-*Salamon* cases have involved jury trials. One exception, however, is *State* v. *Thompson*, 118 Conn. App. 140, 983 A.2d 20 (2009), cert. denied, 294 Conn. 932, 986 A.2d 1057 (2010). In that case, the defendant was convicted of kidnapping in the first degree, sexual assault in the first degree and attempt to commit sexual assault in the first degree. Id., 142–43. On appeal, he argued, inter alia, that his conviction of kidnapping in the first degree should be reversed following the new interpretation of that crime. Id., 143. In the context of a trial to the court, we stated that "the court was required to have made a specific factual finding, if it determined that such a finding was justified by the evidence, that the defendant . . . must have intend[ed] to prevent the victim's liberation for a longer period of time or to a greater degree than that which [was] necessary to commit the other crime." (Internal quotation marks omitted.) Id., 161. We also described a "*Salamon* finding" as "one that, when reasonably supported by the evidence, the restraint was or was not merely incidental to some other, separate crime." Id., 161 n.10.

Our task, therefore, is to examine the facts of the present case through the analytical lens of *Hinds* v. *Commissioner of Correction*, supra, 321 Conn. 56, to determine if the absence of a specific factual finding as required by *Salamon* constituted harmless error. Our standard of review is well established. "[W]hile [t]he

underlying historical facts found by the habeas court may not be disturbed unless the findings were clearly erroneous . . . [q]uestions of law and mixed questions of law and fact receive plenary review." (Internal quotation marks omitted.) Id., 65; see also *Farmer* v. *Commissioner of Correction*, 165 Conn. App. 455, 459, 139 A.3d 767 (2016) (applicability of *Salamon* and whether trial court's failure to give *Salamon* instruction was harmless error constitute issues of law subject to plenary review).

The issue of whether the movement or confinement of a victim merely was incidental to and necessary for another crime, such as sexual assault, is dependent on the facts and circumstances of each case. *State* v. *Salamon*, supra, 287 Conn. 547; see also *State* v. *Hampton*, 293 Conn. 435, 460, 988 A.2d 167 (2009); *Wilcox* v. *Commissioner of Correction*, supra, 162 Conn. App. 743; *Eric M.* v. *Commissioner of Correction*, 153 Conn. App. 837, 843–44, 108 A.3d 1128 (2014), cert. denied, 315 Conn. 915, 106 A.3d 308 (2015). Accordingly, we begin with a detailed recitation of the facts of the present case.

In a long form information dated October 25, 2001, the state charged the petitioner with kidnapping in the first degree as follows: "In the Superior Court of the State of Connecticut at Danbury, Warren Murray, Supervisory Assistant State's Attorney for the Judicial District of Danbury, accuses [the petitioner] of the crime of Kidnapping in the First Degree. It is further charged that in the city of Danbury, Connecticut, on or about the 11th day of November 2000, the said [petitioner], abducted another person, and restrained the person abducted with the intent to sexually abuse that person in violation of Connecticut General Statutes Section 53a-92 (a) (2) (A). This crime occurred in the vicinity of West and Harmony Streets." The state also charged the petitioner with sexual assault in the first degree by means of fellatio, attempt to commit sexual assault in the first degree by means of vaginal penetration, assault in the third degree and threatening.

On April 12, 2002, at the conclusion of the petitioner's criminal trial, the court issued an oral decision finding him guilty on all charges. Specifically, the court stated: "I will indicate that my decision's based on my review of the entire evidence, the testimony of all the witnesses, as well as the exhibits, and I will make some general findings of fact here. And I want to make it clear that my decision isn't limited to the findings I'm going to make now, but I will mention some factual findings specifically, but I've relied on others as well.

"On or about November 11, 2000, at between 8 p.m. and 9 p.m. in the evening, on the—on or near the corner of West Avenue and Harmony Street here in Danbury, the victim . . . was walking in the direction of the Food Bag store and encountered the [petitioner] while

he was riding on his bicycle.

"At that time, the [petitioner] attempted to engage the victim in conversation. The victim indicated that she was not interested in engaging in a conversation and attempted to leave. And at that time the [petitioner] got off of his bicycle, physically grabbed the victim by the legs, dragged her along the ground for a distance of approximately 113 feet to a window well adjacent to a nearby church. The [petitioner] forced the victim into the window well and kept her there for a period of time between an hour-and-a-half and two hours.

"Now, during that encounter, the victim was forced to remove her clothing. She lowered her pants part way, and after she did that the [petitioner] knocked her to the ground and got on top of her and tried to insert his penis into her vagina. As he was doing that, the victim was struggling and screaming, scratching and clawing, but the [petitioner] use[d] superior strength to hold her down in this effort to, as I said, insert his penis into her vagina.

"During the course of their time in the window well, the [petitioner] also grabbed the victim by the hair and forced her head down to his groin area. And on a minimum—or at a minimum of three times, forced her head on—or her mouth onto his penis and inserted in—his penis was inserted into her mouth.

"Also, during the course of the encounter, the victim attempted to escape, repeatedly, and repeatedly the [petitioner] physically stopped her from leaving and, in fact, at one point threatened to kill her and told her that he wasn't going to let her leave until he was finished.

"Well, at some point after, a dark-haired Hispanic male encountered the [petitioner] and the victim, and engaged the [petitioner] in some altercations. The victim finally managed to escape, but was chased by the [petitioner]. And at or about the corner of West Street and Harmony Street, the victim threw herself on the hood of a maroon car driven by Michelle Emmanuel, who was with her boyfriend at the time, and who saw the [petitioner] chasing after the victim. The victim at the time was screaming for help.

"Michelle Emmanuel locked the doors to her car, but continued to watch what was going on. And she says that the—well, the evidence establishes that the victim again tried to get away from the [petitioner]. She ran to a nearby telephone pole or utility pole and held onto it. The [petitioner] pried her from the pole, dragged her to a nearby area between a white house and a detached garage, and appeared to again attempt to sexually assault her.

"At the time of the encounter between the house and the garage, Ms. Emmanuel was flashing her lights in the [petitioner's]—in the victim's direction and honking her horn. [The petitioner] looked at her but continued

doing what he was doing. Ms. Emmanuel called the police who arrived shortly thereafter. . . .

"So, those are some preliminary findings—or general findings of facts. As I indicated, I want to make it clear those aren't the only facts that I'm relying on in making my decision, but I will mention those things specifically. . . .

"Now, the [petitioner] is charged with the crime of kidnapping in the first degree in violation of § 53a-92 (a) (2) of the Penal Code, which provides as follows: A person is guilty of kidnapping in the first degree when he abducts another person and he restrains the person abducted with the intent to abuse her sexually. . . .

"In this case, the credible evidence establishes beyond a reasonable doubt that the [petitioner] abducted the victim, unlawfully restrained her, and restrained her with the intent to sexually abuse her. The [petitioner], without the victim's consent, and against her will, physically held her by her legs, dragged her body from a sidewalk on West Street into a window well of a nearby church and forced her to remain there for close to two hours while he repeatedly forced his penis into her mouth. He told her that he would not let her leave until he was finished and said he would kill her if she did not stop screaming.

"In addition, the [petitioner], while in the window well with the victim, initiated contact between his penis and her vagina in an attempt to engage in sexual intercourse with her. The evidence clearly establishes each of the elements of kidnapping in the first degree, and the court therefore finds the [petitioner] guilty of that charge. That's the first count. . . .

"The credible evidence in this case establishes that the [petitioner] compelled the victim to engage in sexual intercourse in the form of fellatio and that the sexual intercourse in the form of fellatio was accomplished by the use of force against the victim.

"When the [petitioner] and the victim were in the window well together for nearly two hours, the [petitioner] on three occasions held the victim by the hair, physically forced her head down to his groin area and inserted his penis into her mouth. The victim screamed for help, struggled with the [petitioner], and repeatedly tried to escape, but the [petitioner] used violence to prevent her from leaving, as he repeatedly forced her to engage in sexual intercourse by way of fellatio. . . .

"The [petitioner] dragged the victim against her will from an area on West Street into a window well of a nearby church and threw her to the ground after she lowered her pants. He then held her down by placing his body on top of her, and initiated contact between her vagina and his penis without her consent. When the [petitioner's] penis touched the victim's vagina, the victim was moving around in order to prevent him from

penetrating her vagina with it.

"During the course of the attack the [petitioner] told the victim that if she did not stop screaming he would kill her and that he would not release her until he was finished. When the victim repeatedly tried to escape from the window well, the [petitioner] physically prevented her from leaving. . . .

"During the encounter between the [petitioner] and the victim, the [petitioner] dragged the victim's body along the ground, pulled her hair, threw her to the ground, bit her breasts, choked her, physically fought with her, and attempted to insert his penis into her vagina. As a result of the [petitioner's] conduct, the victim suffered numerous scrapes, bruises, abrasions, trauma, and experienced pain. The [petitioner's] conscious objective to engage in the aforementioned conduct, causing physical injury to the victim, was his desire to sexually assault her—or, I should say, the [petitioner's] motivation in consciously engaging in the conduct that I mention, was to sexually assault her. . . .

"In this case, the credible evidence establishes beyond a reasonable doubt that the [petitioner] is guilty of [the crime of threatening]. The [petitioner] used physical force to keep the victim in the church window well for close to two hours while he forced her to perform oral sex on him and attempted to have vaginal intercourse with her, all against her will and without her consent.

"During the course of the attack, the [petitioner] told the victim he would not release her until he was finished and that he would kill her if she did not stop screaming. The victim repeatedly tried to escape from the [petitioner], but was unable to do so because he used violence to stop her. When the [petitioner] told the victim he would kill her, it was his conscious objective to place her in fear of imminent serious physical injury. She was frightened by the [petitioner's] conduct, and his actions in sexually assaulting her and physically assaulting her indicated his intent and ability to carry out his threat."

Certain evidence not mentioned in the court's oral decision describing the window well is pertinent to our analysis. One of the police officers testified that the window well in question was eight feet long, two feet and four inches wide, and four and one-half feet deep. The bottom of the window well was lined with rocks. This testimony was not challenged or refuted during the trial.

We now return to the seminal case of *State* v. *Salamon*, supra, 287 Conn. 509, which established the new interpretation of our kidnapping statutes. In that case, our Supreme Court concluded that the legislature "intended to exclude from the scope of the more serious

crime of kidnapping and its accompanying severe penalties those confinements or movements of a victim that merely are incidental to and necessary for the commission of another crime against that victim. Stated otherwise, to commit a kidnapping in conjunction with another crime, a defendant must intend to prevent the victim's liberation for a longer period of time or to a greater degree than that which is necessary to commit the other crime." Id., 542. It also noted that its holding did not amount to a "complete refutation" of the principles established in our prior kidnapping law. Id., 546.

"First, in order to establish a kidnapping, the state is not required to establish any minimum period of confinement or degree of movement. When that confinement or movement is merely incidental to the commission of another crime, however, the confinement or movement must have exceeded that which was necessary to commit the other crime. [T]he guiding principle is whether the [confinement or movement] was so much the part of another substantive crime that the substantive crime could not have been committed without such acts . . . . In other words, the test . . . to determine whether [the] confinements or movements involved [were] such that kidnapping may also be charged and prosecuted when an offense separate from kidnapping has occurred asks whether the confinement, movement, or detention was merely incidental to the accompanying felony or whether it was significant enough, in and of itself, to warrant independent prosecution. . . .

"Conversely, a defendant may be convicted of both kidnapping and another substantive crime if, at any time prior to, during or after the commission of that other crime, the victim is moved or confined in a way that has independent criminal significance, that is, the victim was restrained to an extent exceeding that which was necessary to accomplish or complete the other crime. Whether the movement or confinement of the victim is merely incidental to and necessary for another crime will depend on the particular facts and circumstances of each case. Consequently, when the evidence reasonably supports a finding that the restraint was *not* merely incidental to the commission of some other, separate crime, the ultimate factual determination must be made by the jury. For purposes of making that determination, the jury should be instructed to consider the various relevant factors, including the nature and duration of the victim's movement or confinement by the defendant, whether that movement or confinement occurred during the commission of the separate offense, whether the restraint was inherent in the nature of the separate offense, whether the restraint prevented the victim from summoning assistance, whether the restraint reduced the defendant's risk of detection and whether the restraint created a significant danger or increased the victim's risk of harm independent of that posed by the separate offense. (Citations omitted;

emphasis in original; footnotes omitted; internal quotation marks omitted.) Id., 546–48.

The court in *Salamon* also affirmed the general principle that an individual could be charged with and convicted of more than one crime arising from the same act or acts, so long as all of the elements of each crime were proven. Id., 548. Last, it noted the limited applicability of the new rule established: "[O]ur holding is relatively narrow and directly affects only those cases in which the state cannot establish that the restraint involved had independent significance as the predicate conduct for a kidnapping. We therefore do not anticipate that our holding will force a major shift in prosecutorial decision making." Id.

As previously stated, the question of whether the movement or confinement of a victim merely was incidental to and necessary for another crime, such as sexual assault, is dependent on the facts and circumstances of each case. To that end, we examine the decisions from our Supreme Court and this court that have considered the issue of whether the failure to apply *Salamon* constituted harmless error. We first discuss the cases that have determined that the absence of the *Salamon* rule amounted to harmless error, and then consider those that reached a contrary conclusion and required a new trial.

We begin with *State* v. *Hampton*, supra, 293 Conn. 438, in which the defendant claimed in his direct appeal that his convictions for kidnapping in the first degree and conspiracy to commit kidnapping in the first degree should be reversed on the basis of *Salamon*. In *Hampton*, the defendant was with his friend, James Mitchell, who received a telephone call from the victim requesting a ride home. Id., 439. After picking her up, the three individuals went to a restaurant. Despite telling the victim that he would drive her home, Mitchell began angrily asking her about her brother. Id. Despite the pleas of the victim, the defendant and Mitchell refused to take her home and instead drove around for approximately three hours. Id. After parking at a closed gas station, where it was dark, Mitchell ordered her out of the car and the defendant pointed a shotgun at her face. Id. Mitchell then sexually assaulted her, and, afterward, both Mitchell and the defendant shot her. Id., 440.

On appeal, our Supreme Court agreed with the state that the failure to give the *Salamon* instruction was harmless because it was clear "beyond a reasonable doubt that the jury's verdict would have been the same in the absence of the impropriety." Id., 462. It reasoned that there was no evidence in the record that could rationally lead a jury to a reach a contrary finding that the restraint of the victim by the defendant was incidental to or inherent in the other crimes. Id., 463. There was a three hour time period from when the defendant and Mitchell had picked up the victim to the commission

of the sexual assault and shooting. Id., 463–64. "The passage of this substantial period of time, which was uncontested by the defendant at trial, clearly shows the defendant's intent to prevent the victim's liberation for a longer period of time or to a greater degree than that necessary to commit the subsequent crimes. His restraint of the victim was *not* incidental to any additional offenses." (Emphasis in original.) Id., 464.

In *Eric M.* v. *Commissioner of Correction*, supra, 153 Conn. App. 839, the petitioner and the victim were in the process of ending their marriage. The petitioner lured the victim into the basement of the marital home where, after forcing her to the ground, he ordered her to put on handcuffs. Id. After binding and gagging her for a period of time, he released her to use the bathroom, and then sexually assaulted her. Id., 839–40. The victim was able to run out of the bathroom, but was tackled and choked unconscious by the petitioner, at which point she fell through a glass storm door. Id., 840. The petitioner then tied her to a bed, where the victim was able to call the police. Id. The petitioner was convicted of two counts of kidnapping in the first degree, unlawful restraint in the first degree, assault in the second degree and sexual assault in a spousal relationship, and this court affirmed his conviction. *State* v. *Eric M.*, 79 Conn. App. 91, 829 A.2d 439 (2003), aff'd, 271 Conn. 641, 858 A.2d 767 (2004).

The petitioner then commenced a habeas action, arguing that his constitutional right to due process was violated because had the jury in his criminal trial been given a *Salamon* instruction, it would not have found him guilty of two counts of kidnapping in the first degree. *Eric M.* v. *Commissioner of Correction*, supra, 153 Conn. App. 841–42. Both the petitioner and the Commissioner of Correction filed motions for summary judgment, and the habeas court granted the latter's motion. Id., 842. It concluded that there was sufficient evidence in the record to show that the restraints imposed on the victim were not incidental to any other crime, and, therefore the failure to give the *Salamon* instruction was harmless beyond a reasonable doubt. Id.

On appeal, we noted that the test for determining harmlessness was "whether it appears beyond a reasonable doubt that the [impropriety] complained of did not contribute to the verdict obtained." (Internal quotation marks omitted.) Id., 845. We also noted the observation in *Luurtsema* v. *Commissioner of Correction*, supra, 299 Conn. 769–70, that "courts will be able to dispose summarily of many cases where it is sufficiently clear from the evidence presented at trial that the petitioner was guilty of kidnapping, as properly defined, [and] that any error arising from a failure to instruct the jury in accordance with the rule in *Salamon* was harmless." (Internal quotation marks omitted.) *Eric M.* v. *Commis-*

*sioner of Correction*, supra, 153 Conn. App. 845. In reviewing the facts from the criminal trial, we noted that the petitioner had sexually assaulted the victim for a few minutes, while the restraint had lasted for approximately five hours. Id., 846. Thus, under these facts, the failure to give the *Salmon* instruction was harmless beyond a reasonable doubt. Id., 847.

In *State* v. *Jordan*, 129 Conn. App. 215, 217, 19 A.3d 241, cert. denied, 302 Conn. 910, 23 A.3d 1248 (2011), the defendant entered the bedroom of his former romantic partner, D, and her new boyfriend, E. The defendant beat E with a stick, and pulled D back into the bedroom by her hair. Id. He then incapacitated D by striking her in the head with the stick. Id. The defendant continued to savagely assault E by using a mop handle to sodomize him while D was directed to clean the blood off the walls. Id., 217–18. The defendant threatened D with a gun and struck E in the head with it. Id., 218. He subsequently was convicted of one count of burglary, two counts of kidnapping in the second degree, two counts of assault in the first degree and one count of sexual assault in the first degree. Id., 216.

On appeal, the defendant claimed that he was entitled to a new trial on the kidnapping charges as a result of the failure of the court to provide the jury with a *Salamon* instruction. Id., 219. The state countered that although such an instruction was required, the court's failure to do so amounted to harmless error "because the state offered sufficient evidence such that no reasonable jury could have concluded that the restraint of the victims by the defendant was merely incidental to the other crimes of assault and sexual assault." Id.

The defendant argued that "the entire forty-five minute confinement of the victims was comprised of the defendant's assaultive action. There was, therefore, no period of time during which the victims were restrained for a greater degree than was necessary to commit the assaults." Id., 222. We iterated that, even subsequent to *Salamon*, the crime of kidnapping does not require a minimum period of confinement. Id. Instead, we determined that the evidence reasonably could not support the conclusion that the restraint of the victims by the defendant was merely incidental to the assaults and the sexual assault. Id. Specifically, we concluded that he had restricted the movement of the victims to a far greater degree than necessary to assault them. Id. Further, while he was assaulting one victim, the other was not free to leave, and when neither was being assaulted, he controlled their movement by not allowing them to leave. Id., 222–23.

In *State* v. *Strong*, 122 Conn. App. 131, 134, 999 A.2d 765, cert. denied, 298 Conn. 907, 3 A.3d 73 (2010), the defendant was convicted of a multitude of crimes, included kidnapping in the first degree and threatening in the second degree. The victim and the defendant,

whose marriage was "plagued by violence," had separated. Id. The defendant requested the victim to meet him in a parking lot. Id. Eventually he retrieved a pistol and threatened to kill her if she did not follow his instructions. Id., 134–35. After ordering her to drive to a desolate area, the defendant then ordered her to drive to the home of one of his friends. Id., 135. The defendant told the victim that his friends were "going to rape her." Id. The defendant held her there for more than one hour before returning her to the parking lot. Id., 135–36. The defendant continued terrorizing her that night and the next morning, including running her car off the road when she was driving to work. Id., 136.

On appeal, we considered the issue of whether the lack of the *Salamon* instruction, under these facts, amounted to harmless error. Id., 139. In answering that question in the affirmative, we concluded that the verdict would have been the same in the absence of the claimed impropriety. Id., 142. Specifically, we pointed to the overwhelming evidence of kidnapping as a result of the defendant's having ordered the victim to drive from the parking lot to the friend's house and having held her against her will in the car. Id., 143. The evidence of threatening consisted of his threat to kill her, repeatedly yelling at her, and the threat that his friends would sexually assault her. Id. "The defendant's prolonged restraint of the victim in her car while forcing her to drive . . . and while forcing her to remain in the car reasonably could not be considered merely incidental to either of the threatening charges." Id. Put another way, there was no evidence that rationally could have led the jury to conclude that the restraint was inherent in or incidental to the threatening. Id.

In *State* v. *Nelson*, 118 Conn. App. 831, 833, 986 A.2d 311, cert. denied, 295 Conn. 911, 989 A.2d 1074 (2010), the defendant was convicted of the crimes of kidnapping, assault and burglary. As the victim entered his apartment, he was ambushed by the defendant and an accomplice, and was bound at the hands and feet. Id., 834. The assailants struck the victim, demanded money, and tortured him by burning his face and abdomen. Id. After approximately one hour, the assailants placed the victim in an automobile and drove around looking for an individual who owed the victim money. Id., 835. After an additional assault, the victim was left partially bound in his automobile near a high school. Id., 836. These events occurred over nearly five hours. Id.

On appeal, we agreed with the defendant that the jury should have received the *Salamon* instruction. Id., 860. The state argued that this error was harmless because the victim had been restrained for several hours after the completion of the assault. Id. In affirming the defendant's conviction of kidnapping, we noted: "The substantial length of the victim's restraint following the assaultive conduct by the defendant is signifi-

cant to our analysis. The defendant's restraint during such a substantial amount of time is overwhelming evidence of the defendant's intent to prevent the victim's liberation for a longer period of time than that necessary for the commission of any other crime. Stated otherwise, after reviewing all of the evidence presented, we do not believe that a rational jury could find that the defendant's restraint of the victim was inherent in, or incidental to, assault or any other crime." Id., 861.

We also are guided by our Supreme Court's decision in *State* v. *Ward*, 306 Conn. 718, 725–26, 51 A.3d 970 (2012), a case in which the trial court granted the defendant's motion for a judgment of acquittal following the jury's finding of guilt on the charges of sexual assault in the first degree and kidnapping in the first degree. In *Ward*, the victim was alone in her rural home when the defendant, who was nearly double her size, requested water for his overheated vehicle. Id., 722. When he returned for additional water, he pushed open the door, grabbed a metal knife sharpening tool, wrapped his arms around the victim and threatened to kill her if she did not follow his instructions. Id. 723. With the sharpening tool held to the victim's neck, the defendant dragged her down the hallway and into the master bedroom. Id. Once there, he pushed the victim onto the bed, removed some of her clothes, and then pulled her to the floor. Id., 723–24. He then sexually assaulted her. Id., 724.

The trial court provided the jury with the *Salamon* instruction. Id., 726. After the jury found the defendant guilty on both counts, the court granted the defendant's motion for a judgment of acquittal as to the kidnapping charge on the basis of *Salamon*. Id., 725. Specifically, the trial court concluded that "no reasonable jury could have found under [the facts adduced at trial] that the defendant kidnapped the victim as defined by our statutes." (Internal quotation marks omitted.) Id., 725–26. The trial court emphasized that the incident occurred during a ten to twenty minute time period, the relatively small size of the victim's home, the minimal movement from the kitchen to the bedroom, and the incidental and minimal use of the weapon. Id., 728.

In reviewing the granting of the motion for a judgment of acquittal, our Supreme Court, after noting that it was a close case, concluded that the jury, having received the *Salamon* instruction, reasonably could have found that the confinement or movement of the victim was not merely incidental to the sexual assault. Id., 736. Specifically, it noted that the victim could not escape from the defendant, who was twice her size and who held her very tightly. Id. The movement of the victim from the kitchen door made the chance of escape more remote. Id. The defendant could have sexually assaulted her without threatening to kill her or without holding the weapon to her neck, and therefore, the force used

by the defendant exceeded that which was necessary to commit the sexual assault. Id. The conduct of the defendant was intended to frighten and subdue the victim so as to prevent her from struggling, seeking assistance or attempting to escape. Id. Further, the use of the weapon increased the risk of harm to the victim, and movement from the kitchen door made it less likely that the criminal conduct would be detected. Id., 736–37. Last, had the defendant intended to move her to a location more comfortable for him, he could have placed her on the bed; instead, he eventually pulled her to the floor before sexually assaulting her. Id., 737.

"In short, although the defendant did not confine the victim for a lengthy period of time or move her a significant distance, the facts and circumstances of the present case, considered as a whole, support the jury's determination that the restraint of the victim was not merely incidental to or an inherent part of the sexual assault. Our decision is not based on any single fact, but on the cumulative effect of the evidence adduced at trial." (Footnote omitted.) Id., 738. Our Supreme Court noted that in the absence of even one of the facts relied upon by the state in its argument, it may have reached a different result. Id., 738 n.12.

To complete our analysis of the parameters of the harmless error inquiry under *Hinds*, we now turn to the cases in which a reviewing court determined that the failure to apply the *Salamon* standard was not harmless and required a new trial. For example, in *State* v. *Fields*, 302 Conn. 236, 238, 24 A.3d 1243 (2011), the defendant was convicted, inter alia, of two counts of kidnapping in the second degree and one count of assault in the first degree. One of the victims, Marilyn Cortes, ended an abusive relationship with the defendant and lived with, inter alia, her daughter and her daughter's brother-in-law, Taoufik Razek. Id., 239–40. The defendant entered Cortes' new residence without permission and stole $500. Id., 240–41. The next day, the defendant promised to return the money to Razek at a coffee shop; this, however, was a ruse to get him out of the residence. Id., 241–42. The defendant then went to the residence and forced Cortes at gunpoint to the bedroom, where he bound her wrists and covered her mouth with duct tape. Id., 242. He then drove Cortes to a gas station to pick up an accomplice, and then returned to the residence. Id.

Razek subsequently returned to the residence and was physically assaulted by the defendant. Id., 242–43. The defendant then struck Cortes in the face after she had been prevented by the accomplice from calling the police. Id., 243. After the defendant threatened to kill Razek, a towel was wrapped over Razek's head and he was placed into the backseat of a car. Id. Razek managed to escape from the car and call the police. Id., 243–44.

On appeal, the defendant argued that he was entitled to a new trial with respect to the kidnapping charge as to Razek as a result of the court's failure to instruct the jury in accordance with *Salamon*. Id., 244–45. Our Supreme Court rejected the state's argument that *Salamon* did not apply and turned to the issue of harmlessness. Id., 248–50. In rejecting the state's argument, the court noted that there was conflicting testimony from the two victims as to whether it was the defendant or the accomplice who forcibly moved Razek to the car. Id., 250. If the jury had credited Cortes' version of events, it might have found the defendant guilty of kidnapping solely on the basis of the restraint during the actual assault. Id., 251. It further noted that the state had charged the defendant with the kidnapping of Razek, and not with conspiracy to commit kidnapping or being an accessory to kidnapping. Id., 252. Under these circumstances, the lack of a *Salamon* instruction was not harmless beyond a reasonable doubt. Id., 253.

In *State* v. *Flores*, 301 Conn. 77, 79–80, 17 A.3d 1025 (2011), the defendant was convicted of numerous offenses, including kidnapping in the first degree and robbery in the first degree. The defendant and two accomplices, wearing dark clothes and ski masks, entered the bedroom of the victim and her boyfriend. Id., 80–81. The defendant tapped the victim on the shoulder with a gun and asked her where she kept her money. Id., 81. The defendant attempted to cover her mouth with duct tape, but she resisted. Id. The victim, who knew the defendant socially and deduced his identity, believed his statement that he was not going to hurt her. Id. One of the defendant's accomplices placed the gun in the mouth of the victim's boyfriend, and the other accomplice struck the boyfriend in the head after he attempted to escape out of a window. Id., 81–82. After taking some of the possessions from the apartment, the defendant and his accomplices left. Id., 82. The time frame of the incident was between five and twenty minutes. Id.

On appeal, the state conceded that a *Salamon* instruction should have been given, but argued that it was harmless error. Id., 83. In reviewing this claim, our Supreme Court noted that, due to the manner in which the state had charged the defendant, the kidnapping charge applied only to the victim, and not the victim's boyfriend. Id., 85. Additionally, the state did not claim that the period of restraint exceeded the time necessary to commit the robbery, so its appellate argument was limited to the issue of the amount of force used to restrain the victim. Id. Because the victim was not bound or moved physically during the commission of the robbery, which lasted for no more than five minutes, and was released immediately upon the conclusion of the robbery, our Supreme Court determined that it would have been reasonable for a jury to find, if

instructed properly, that the restraint did not rise to the level of a kidnapping apart from the armed robbery. Id., 87. In short, under the facts and circumstances presented, "at what point the force used to commit the robbery [became] so excessive as to have independent criminal significance [was] a quintessential question of fact for determination by the jury." Id., 89.

In *Epps* v. *Commissioner of Correction*, 153 Conn. App. 729, 731, 108 A.3d 1128 (2014), the petitioner had been convicted of kidnapping and assault. The petitioner and the victim had been engaged, but the victim wanted to end the relationship after learning that the petitioner had contracted a sexually transmitted disease. Id., 732. While in the petitioner's van, the victim ended the relationship, at which time he pulled her into the backseat and attempted to choke her several times. Id. Eventually, she returned to the front seat, at which time the petitioner poured gasoline on her and set her on fire. Id. The petitioner testified that he only had hit her in self-defense and that after he left the van, the victim had set herself on fire. Id., 733.

In his habeas petition, the petitioner claimed error in his criminal trial because the jury had not received the *Salamon* instruction. Id. In addressing the issue of prejudice as a result of inadequate kidnapping instructions, we applied the harmless error standard subsequently mandated by our Supreme Court in *Hinds* v. *Commissioner of Correction*, supra, 321 Conn. 256. *Epps* v. *Commissioner of Correction*, supra, 153 Conn. 740. In concluding that the state had not met its burden, we stated: "This is not a case in which the allegations that gave rise to the kidnapping charge, or any of the charges, were uncontested and supported by overwhelming evidence. Although the incident endured longer than it took to commit the assault, the evidence is not undisputed or overwhelming that the victim's movements were restricted by the petitioner during all or portions of that incident, if at all. The victim testified that the petitioner repeatedly held her down, by sitting on top of her and pinning her down with his knees to restrain her, even when he was not hitting or choking her. The petitioner disputed those allegations. In proceeding through an iteration of the evidence presented at trial, and the permissible inferences that may be drawn from that evidence, concerning the duration of the subject incident, the actions of the petitioner and the actions of the victim, the commissioner is asking this court to weigh that evidence, little of which was undisputed, and the majority of which consisted of the testimony of the petitioner versus the testimony of the victim. Such is not a task that is properly ours to undertake." Id., 741.

In *State* v. *Thompson*, supra, 118 Conn. App. 142–43, the defendant, following a court trial, was convicted of kidnapping in the first degree, sexual assault in the first

degree and attempt to commit sexual assault in the first degree. The defendant, a drug dealer, entered the vehicle driven by the victim, who was seeking to purchase drugs. Id., 143–44. The victim previously had purchased drugs on credit from the defendant but had not yet paid for them. Id. The defendant refused the victim's offer to pay him, slapped her, and ordered her to pull the vehicle over. Id., 144. After the defendant removed the keys from the ignition, the victim attempted to flee but was grabbed by the defendant and pulled to the side of a nearby building. Id. The victim, after receiving several punches, complied with the defendant's demand that she remove her clothes. Id. The defendant then sexually assaulted her. Id. The entire episode lasted fifteen to twenty minutes. Id. The defendant forced the victim into the passenger's seat and drove on several streets. Id. At some point, the victim escaped. Id., 144–45.

On appeal to this court, the defendant claimed that his conviction of kidnapping should be reversed on the basis of *Salamon* and its progeny. Id., 154. After reviewing the relevant cases from our Supreme Court; see id., 154–60; we noted that our review was limited to the defendant's conduct up to the completion of the sexual assault because § 53a-92 (a) (2) requires the intent to either physically injure or violate or abuse the victim sexually. Id., 160–61. Thus, under the facts of the case, our analysis was limited to the conclusion of the sexual assault. Id. We further noted that the trial court, as the finder of fact, "was required to have made a specific factual finding, if it determined that such a finding was justified by the evidence, that the defendant in this matter must have intend[ed] to prevent the victim's liberation for a longer period of time or to a greater degree than that which [was] necessary to commit the other crime." (Internal quotation marks omitted.) Id., 161.

We determined that this court could not supply the required findings. Id., 162. "Put simply, we are unable to conclude that the evidence before us does not reasonably support a finding that the defendant's restraint of the victim was or was not so inextricably linked to the underlying crime itself. . . . Contrary to the state's contention, it is not clear beyond a reasonable doubt that the verdict would have been the same in the absence of the alleged impropriety. The state's evidence was not so overwhelming that it would prevent a converse finding by the fact finder as to whether the defendant's restraint of the victim was inherent in, or merely incidental to, the sexual assault." (Citation omitted.) Id.

We conclude our review of the relevant cases, with facts that fairly can be described as a literal parade of horribles, with *Hinds* v. *Commissioner of Correction*, supra, 321 Conn. 56. As we previously detailed, our Supreme Court eliminated the application of the proce-

dural default doctrine in cases involving a collateral attack on a final judgment rendered prior to the *Salamon* decision. Id., 76. We also, however, must consider the facts, as well as the reasoning that supported the conclusion that the lack of the *Salamon* instruction was not harmless error. In *Hinds*, the victim left a grocery store and was walking to a friend's apartment located nearby. Id., 61. The victim cut through a parking lot where she was followed by the petitioner, causing her to run. Id., 61–62. The petitioner pursued and grabbed her, putting one hand around her waist and the other briefly over her mouth. Id., 62. After threatening to kill the victim if she screamed, he threw her to the ground and dragged her by the legs to a grassy area, behind a bush, where it was darker. Id. The petitioner sat on the victim's chest with his legs outside her arms so that she could not move, and ordered her to open her mouth. Id. He forced her to perform fellatio on him, and after ejaculating in her mouth, patted her on the cheek and told her that she could leave. Id. The victim, frozen in fear, remained; so the petitioner entered his vehicle and left. Id. During his trial, the jury was not given the *Salamon* instruction. See id.

Addressing the issue of harmlessness, the court noted that it was required to "consider the legal parameters set forth in *Salamon*, and the standard for assessing whether the omission of such guidance to the jury requires reversal of the petitioner's kidnapping conviction." Id., 76–77. It stated that if the evidence regarding a defendant's intent was susceptible to more than a single interpretation, then the question was one for the fact finder. Id., 79. "The petitioner's actions in the present case were a continuous, uninterrupted course of conduct lasting minutes. The petitioner could not accomplish the sexual assault without grabbing [the victim] and bringing her to the ground. He released [the victim] as soon as the sexual assault was completed. Thus, the essential fact is the movement of [the victim]. [The victim's] asportation from the spot where she was grabbed to the site of the sexual assault, however, appears to be a matter of yards and accomplished in a matter of seconds. Although that movement took [the victim] from the lit parking lot to the adjacent dark ground by a bush, an act that undoubtedly reduced the risk of detection in one regard, it also brought [the victim] in very close proximity to an occupied residence in the lot adjacent to the parking lot. There is no evidence that the risk of harm to [the victim] was made appreciably greater by the asportation in and of itself. A properly instructed jury reasonably could conclude that the petitioner's intention in moving [the victim] from the lit lot to the dark, grassy area was to prevent her from being able to get a good look at his face, because he could not perform in the lit space, or simply to avoid the hard paved surface while kneeling on the ground." (Footnotes omitted.) Id., 79–80.

The court later noted that the victim's ability to escape was not diminished as a result of the movement from the parking lot to the grassy area and, aside from the brief moment when the petitioner placed his hand over her mouth, the victim's physical ability to summon help was impaired solely due to the nature of the sexual assault. Id., 87. It also quoted, with approval, from a decision by the Superior Court: "Although no minimum period of restraint or degree of movement is necessary for the crime of kidnapping, an important facet of cases where the trial court has failed to give a *Salamon* instruction and that impropriety on appellate review has been deemed harmless error is that longer periods of restraint or greater degrees of movement demarcate separate offenses. . . . Thus . . . multiple offenses are more readily distinguishable—and, consequently, more likely to render the absence of a *Salamon* instruction harmless—when the offenses are separated by greater time spans, or by more movement or restriction of movement. Conversely, multiple offenses occurring in a much shorter or more compressed time span make the same determination more difficult and, therefore, more likely to necessitate submission to a jury for it to make its factual determinations regarding whether the restraint is merely incidental to another, separate crime. In those scenarios, where kidnapping and multiple offenses occur closer in time to one another, it becomes more difficult to distinguish the confinement or restraint associated with the kidnapping from another substantive crime. The failure to give a proper *Salamon* instruction in those scenarios is more likely to result in harmful error precisely because of the difficulty in determining whether each crime has independent criminal significance." (Citations omitted; internal quotation marks omitted.) Id., 92–93; see also *Wilcox* v. *Commissioner of Correction*, supra, 162 Conn. App. 743–46.

Against this backdrop we now consider the present case. As made abundantly clear by our review of the precedents from this court and our Supreme Court, this determination requires a detailed consideration of the facts and circumstances relating to the criminal conduct. Here, the criminal trial court found that the petitioner encountered the victim on a street corner, got off his bicycle, physically grabbed the victim by the legs, dragged her along the ground for approximately 113 feet to the window well of a nearby church.[8] The petitioner forced the victim into a window well, which, according to the uncontested evidence, was four and one-half feet deep[9] and lined with rocks. The petitioner kept her in the window well for a period of time between ninety and one hundred and twenty minutes.

While in the window well, the petitioner forced the victim to lower her pants, at which time he knocked her to the ground. He got on top of her and attempted to insert his penis into her vagina. The victim struggled

and screamed[10] while scratching and clawing the petitioner. Her attempts at self-defense, however, were unsuccessful, as the petitioner used his superior strength to hold the victim down during his attempt at sexual assault by way of vaginal penetration.[11] The petitioner grasped the victim's hair and forced his penis inside her mouth on three separate occasions during the encounter. The victim testified that the total time of oral penetration was five minutes, and this was not contradicted at any point by the petitioner.

The criminal trial court found that the victim repeatedly tried to escape and that the petitioner repeatedly prevented her from doing so. At some point, a third party interrupted the petitioner, and, at this point the victim was able to escape from the window well. While being chased by the petitioner, the victim jumped onto the hood a car located at the corner of West Street and Harmony Street. The victim pleaded for help from the occupants of the car, and then, in an effort to get away from the petitioner, ran to a nearby telephone pole and held onto it. At that point, the petitioner pried her off,[12] dragged her to a nearby area between a house and detached garage, and again attempted to sexually assault her. The police arrived shortly thereafter,[13] at which point the petitioner fled from the scene.

We conclude that the present case is more analogous to the cases where a reviewing court concluded that the lack of the *Salamon* instruction was harmless error and distinguishable from those cases[14] in which the absence of the *Salamon* instruction or finding required a new trial. In order to reach this conclusion, we carefully have reviewed and considered both the facts and the legal reasoning of the precedent cited herein. We are satisfied that the respondent has met his burden.[15]

To answer the question of whether the absence of the *Salamon* standard constituted harmless error requires us to examine the factors and principles enunciated in that case. We iterate that "[a] defendant may be convicted of both kidnapping and another substantive crime if, at any time prior to, during or after the commission of that other crime, the victim is moved or confined in a way that has independent criminal significance, that is, the victim was restrained to an extent exceeding that which was necessary to accomplish or complete the other crime. . . . For the purposes of making that determination, the [fact finder should] consider the various relevant factors, including the nature and duration of the victim's movement or confinement by the defendant, whether that movement or confinement occurred during the commission of the separate offense, whether the restraint was inherent in the nature of the separate offense, whether the restraint prevented the victim from summoning assistance, whether the restraint reduced the defendant's risk of detection and whether the restraint created a significant danger or increased the

victim's risk of harm independent of that posed by the separate offense." *State* v. *Salamon*, supra, 287 Conn. 547–48; see also *Hinds* v. *Commissioner of Correction*, supra, 321 Conn. 78–79.

Here, the petitioner pulled the victim to the ground and dragged her 113 feet to the window well, but it is unclear how long this process took, as the evidence indicates that the victim was resisting this movement. The petitioner's movement of the victim in this case is distinguishable from the facts in *Hinds*, where the victim was moved "only a matter of yards," which occurred in a matter of seconds. *Hinds* v. *Commissioner of Correction*, supra, 321 Conn. 80. Furthermore, while the events of *Hinds* were described as a "continuous, uninterrupted course of conduct lasting minutes"; id., 79; in the present case, the petitioner's criminal conduct continued for nearly two hours and was interrupted by both the actions of a third party and the victim's attempts to escape. Moreover, the petitioner dragged the victim more than 100 feet from the site of their initial encounter to the window well, and then moved her from the telephone pole to the area between the white house and detached garage. In contrast to the facts of *Hinds*, there was no evidence that one area was lit or that there was an occupied building. See id., 80. Additionally, the risk of harm to the victim in the present case was appreciably greater as a result of the movement to the restrictive area within the window well, which was lined with rocks. Cf. *Hinds* v. *Commissioner of Correction*, supra, 80. This movement to the window well also served to reduce the likelihood of detection. Nor could a reasonable fact finder conclude that the window well was more conducive for the crime of sexual assault. See *State* v. *Ward*, supra, 306 Conn. 737.

Most significantly, the asportation of the victim to the window well diminished her ability to escape.[16] See *Hinds* v. *Commissioner of Correction*, supra, 321 Conn. 87. The victim was placed in an area, essentially a deep hole, that served as a secondary restraint on her movement, the first being the physical restraint by the petitioner. The confines of the window well severely limited the victim's escape routes. By limiting the direction in which she could flee, the petitioner had a greater ability to control her movement. Additionally, even when the five and one-half foot tall victim was able to escape from the physical custody of the petitioner, the depth of the window well, which measured four and one-half feet, appreciably debilitated her ability to escape because of the inherent and obvious difficulty in climbing out.[17] In other words, the window well served as a second level of restraint on the victim, orchestrated by the petitioner, and a reasonable fact finder could not conclude that this additional restraint was necessary to complete the crime of sexual assault or attempt to commit sexual assault. See id., 92; see also *State* v.

*Wilcox*, supra, 162 Conn. App. 748; *Eric M*. v. *Commissioner of Correction*, supra, 153 Conn. App. 846–47; *State* v. *Jordan*, supra, 129 Conn. App. 222–23. Moreover, a fact finder reasonably could not conclude that the confinement of the victim in the window well was merely incidental to and necessary for the commission of the sexual assault charges. Simply put, the confinement of the victim in the window well had independent criminal significance.

Furthermore, after the victim was able to escape from the window well, the petitioner chased after her. The victim threw herself on the hood of a car and then clutched a telephone pole, at which point the petitioner ordered her to let go of the telephone pole, grabbed her arms, and choked the victim until she was left with no choice but to release her grip. The petitioner then dragged the victim to an area between the white house and detached garage and again attempted to sexually assault her. These additional acts by the petitioner further evidence an intent to frighten the victim, to prevent her escape, and to restrain her more than was necessary to sexually assault her or attempt to commit that crime.

The facts of the present case also are distinguishable from those found in *Salamon, DeJesus* and *Sanseverino*, the trilogy of cases in which our Supreme Court reconsidered its interpretation of our statutes and determined that restraint incidental to the commission of another offense no longer constituted the crime of kidnapping. In *State* v. *Salamon*, supra, 287 Conn. 514–15, the fifteen year old victim disembarked a train in Stamford after falling asleep. The defendant followed her into a stairwell in the train station. Id., 515. The defendant grabbed the victim by the back of her neck, causing her to fall to the ground and injure her elbow. Id. The defendant then positioned himself next to the victim and held her down by the hair. Id. After the victim screamed, the defendant punched her in the mouth and attempted to place his fingers in her throat. Id. The victim was able to escape. Id. A jury found the defendant guilty of kidnapping in the second degree, unlawful restraint in the first degree and risk of injury to a child. Id., 512–13.

In *State* v. *DeJesus*, supra, 288 Conn. 423–24, the defendant, a manager of a supermarket, instructed the victim to go into a room in the upper level of the store. The defendant entered the room, removed the victim's pants and underwear and instructed her to sit on a desk. After ignoring the victim's statement that she did not want to do this, the defendant sexually assaulted the victim. Id., 423. Afterward, the victim moved away from the defendant, put on her clothes, and left the room. Id. The defendant was convicted of two counts of sexual assault in the first degree and one count of kidnapping in the first degree. Id., 420–21.

In *State* v. *Sanseverino*, supra, 291 Conn. 581, the

defendant, the owner of a bakery, followed the victim, G, into the back room and grabbed her. He pushed the victim against the wall and forced her arms over her head. Id. The victim could not move because the defendant pressed his body against her. Id. After pulling down her pants, and then his, the defendant sexually assaulted the victim. Id. He then released the victim. Id. The defendant subsequently was convicted of kidnapping in the first degree and sexual assault in the first degree. Id., 583.

In *Salamon*, *DeJesus* and *Sanseverino*, the jury reasonably could have found that the restraint of the victims was incidental to the commission of another offense, and therefore the convictions of kidnapping could not stand. In this case, however, the petitioner's restraint and movement of the victim had independent criminal significance to support his conviction of kidnapping. Moreover, we are mindful of our Supreme Court's observations that the *Salamon* rule did not constitute a "complete refutation"; *State* v. *Salamon*, supra, 287 Conn. 546; of the principles in its prior kidnapping jurisprudence and that its holding was "relatively narrow and directly affects only those cases in which the state cannot establish that the restraint involved had independent significance as the predicate conduct for a kidnapping." Id., 548.

Under the facts and circumstances of this case, we conclude that a reasonable fact finder, under the proper interpretation of our kidnapping law, could not find that the restraint of the victim was merely incidental to or an inherent part of the sexual assault crimes. Given the uncontested and overwhelming evidence before the criminal trial court, we conclude that that judgment would have been the same had Judge White applied the law set forth in *Salamon*. The evidence presented by the state, considered as a whole; see *State* v. *Ward*, supra, 306 Conn. 738; would prevent a finding that the restraint in this case was inherent in, or merely incidental to, the crimes of sexual assault and attempt to commit sexual assault. See *State* v. *Thompson*, supra, 118 Conn. App. 162. The failure of the criminal trial court to make the *Salamon* finding was harmless error.

The judgment is reversed and the case is remanded with direction to deny the petitioner's amended petition for a writ of habeas corpus.

In this opinion the other judges concurred.

[1] In his main and reply briefs, the respondent also argued that the habeas court improperly (1) considered the petitioner's due process claim before addressing the cause and prejudice test to defeat the affirmative defense of procedural default and (2) determined that the petitioner had established "good cause" for failing to raise his *Salamon* claim on direct appeal.

After oral argument, our Supreme Court released its decision in *Hinds* v. *Commissioner of Correction*, 321 Conn. 56, 136 A.3d 596 (2016), which we will discuss extensively. The *Hinds* decision held that the petitioner's *Salamon* claim was not subject to the procedural default doctrine. Id., 76. Following publication of the *Hinds* decision on the Judicial Branch website, we ordered the parties, sua sponte, to file simultaneous supplemental briefs,

addressing the effect of the *Hinds* decision on the present case. We received the briefs from the parties on May 9, 2016.

In the respondent's supplement brief, he stated: "Assuming the holding of *Hinds* is final, it is binding. Thus the [respondent's] claims in his main and reply briefs that the habeas court incorrectly applied the standards under the procedural default doctrine fail." The respondent further explained that *Hinds* was decided incorrectly and did not "withdraw his claims addressed in his main and reply briefs."

As an intermediate appellate court, we, of course, are bound by the decisions of our Supreme Court. See *State* v. *Madera*, 160 Conn. App. 851, 861–62, 125 A.3d 1071 (2015); *State* v. *Grant*, 149 Conn. App. 41, 54, 87 A.3d 1150, cert. denied, 312 Conn. 907, 93 A.3d 158 (2014). We agree with the respondent that his claims regarding the procedural default doctrine must fail in the present case. The only issue left, therefore, is whether the respondent established that the court's failure to apply the *Salamon* standard in the petitioner's 2002 criminal trial was harmless error.

[2] In *State* v. *Nogueira*, supra, 84 Conn. App. 820, the issue before this court was whether the denial of a motion to suppress the out-of-court identification of the petitioner by the victim violated his due process right to a fair trial. Therefore, our recitation of these facts originated from the victim's testimony at the hearing on the motion to suppress. In this opinion, we will set forth the facts found by the criminal trial court that supported the petitioner's conviction.

[3] Other cases during this time period that altered the interpretation of our kidnapping statutes include *State* v. *Sanseverino*, 287 Conn. 608, 949 A.2d 1156 (2008), overruled in part by *State* v. *DeJesus*, 288 Conn. 418, 437, 953 A.2d 45 (2008), and superseded in part after reconsideration by *State* v. *Sanseverino*, 291 Conn. 574, 579, 969 A.2d 710 (2009), overruled in part by *State* v. *Payne*, 303 Conn. 538, 548, 34 A.3d 370 (2012).

[4] Judge Nazzaro determined, in the context of the issue raised in the petitioner's first habeas trial, that there was more than incidental restraint in this case. Specifically, he stated: "[T]here was overwhelming evidence of a struggle, of a dragging of the body, of the pleas for help, the screaming, the re-assaults if you will, the oral violation of the victim, the attempted vaginal violation, the constant withholding of the liberty of the victim, so there is no question there is sufficient evidence of guilt on all the charges." *Nogueira* v. *Warden*, supra, 2011 WL 3890968, *10. He later noted in the memorandum of decision that "because of the abundance of evidence that the restraint was far more than incidental," an appeal based on *State* v. *Salamon*, supra, 287 Conn. 509, would not have succeeded. *Nogueira* v. *Warden*, supra, 2011 WL 3890968, *13.

[5] The petitioner subsequently abandoned his claims of ineffective assistance of his prior habeas counsel.

[6] On the basis our decisions in *Hinds* v. *Commissioner of Correction*, 151 Conn. App. 837, 97 A.3d 986 (2014), aff'd, 321 Conn. 56, 136 A.3d 596 (2016), and *Epps* v. *Commissioner of Correction*, 153 Conn. App. 729, 108 A.3d 1128 (2014), the habeas court concluded that the petitioner had satisfied the cause and actual prejudice prongs, and therefore was not procedurally defaulted. With respect to the latter, the court stated: "Having reviewed the entire record in this case, the court is not satisfied beyond a reasonable doubt that the omitted element was uncontested or supported by overwhelming evidence, such that the jury verdict would have been the same had the correct instruction on the charge of kidnapping applied by the [criminal] trial court. Although the incident took place over an extended period of time, the evidence and findings of the [criminal] trial court indicate that the victim was assaulted during that time, except for short periods when he was interrupted or the victim escaped. When the victim escaped and was caught by the petitioner, he again restrained her and assaulted her during that time until the police arrived. Thus, given the proximity in time and location of the restraint and abduction to the sexual assault and other charges, there is a reasonable probability that absence of the proper charge prejudiced the petitioner and subsequently impacted the trial. Although the evidence supporting the other charges was overwhelming, this cannot be said of the charge of kidnapping, making it a question properly for a jury or trier of fact to decide."

It then concluded that "the petitioner's due process rights were violated by the absence of the application of the [criminal] trial court of the *Salamon* charge on kidnapping. In addition, the court rejects the respondent's affirmative defense of procedural default finding that the petitioner has established cause for not raising the issue in his direct appeal, and prejudice, in that

the absence of the proper kidnapping instruction significantly impacted the trial such that the petitioner suffered actual prejudice."

[7] The court in *Hinds* noted that the procedural default standard set forth in *Wainwright* v. *Sykes*, 433 U.S. 72, 97 S. Ct. 2497, 53 L. Ed. 2d 594 (1977), had been adopted in Connecticut. "Under this standard, the petitioner must demonstrate good cause for his failure to raise a claim at trial or on direct appeal and actual prejudice resulting from the impropriety claimed in the habeas petition. . . . [T]he cause and prejudice test is designed to prevent full review of issues in habeas corpus proceedings that counsel did not raise at trial or on appeal for reasons of tactics, inadvertence or ignorance . . . . The cause and prejudice requirement is not jurisdictional in nature, but rather a prudential limitation on the right to raise constitutional claims in collateral proceedings." (Citation omitted; internal quotation marks omitted.) *Hinds* v. *Commissioner of Correction*, supra, 321 Conn. 71.

[8] The victim also testified that she struggled "[t]he whole time, at every moment" during the time period that the petitioner dragged her to the window well. This testimony was not contested by the petitioner.

[9] The depth of the window well is significant because the victim testified that she was five and one-half feet tall, so being placed in this window well made escape substantially more difficult as she not only had to break away from the physical restraint of the petitioner, but also had to climb out of what amounted to a deep hole in the ground. Additionally, the depth reduced the risk of detection of the petitioner's criminal conduct. These factors were not present in *Hinds* v. *Commissioner of Correction*, supra, 321 Conn. 59.

[10] The victim stated that she implored the petitioner to "leave her alone" and to let her go, but he instructed her to "shut up" and ordered her not to cry. Again, this testimony was not disputed during the criminal trial.

[11] The victim testified that she tried on several occasions to get out, but that she was not able. She also stated that the petitioner punched her and threatened to kill her. During this point, she pleaded with the petitioner to not "hurt me anymore."

[12] The victim testified that while she clung to the telephone pole, the petitioner demanded that she let go, and then pulled on her arms in an effort to remove her from the pole before strangling her, which caused her to release her grip.

[13] The victim indicated that period of time was "not even five or ten minutes . . . ."

[14] See *State* v. *Fields*, supra, 302 Conn. 253; *State* v. *Flores*, supra, 301 Conn. 83; *Epps* v. *Commissioner of Correction*, supra, 153 Conn. App. 742; *State* v. *Thompson*, supra, 118 Conn. App. 161.

[15] We note that we were not presented with a case in which the time of the underlying offense was brief and was either preceded or followed by an extended period of restraint. See, e.g., *State* v. *Hampton*, supra, 293 Conn. 435 (victim restrained for three hours prior to assaults); *Farmer* v. *Commissioner of Correction*, supra, 165 Conn. App. 462 (victim restrained for six to seven hours following assault); *Eric M.* v. *Commissioner of Correction*, supra, 153 Conn. App. 846 (sexual assault lasted few minutes and entire period of restraint occurred during a period spanning at least five hours); *State* v. *Kirby*, 137 Conn. App. 29, 51, 46 A.3d 1056 (defendant assaulted victim with stun gun in her home and then took victim for circuitous drive on back roads of New London County with time spent at his home), cert. denied, 307 Conn. 908, 53 A.2d 222 (2012); *State* v. *Strong*, supra, 122 Conn. App. 131 (defendant restrained victim for prolonged period and made two brief threats to kill victim and permit his friends to sexually assault her); *State* v. *Nelson*, supra, 118 Conn. App. 831 (significant period of restraint following assault).

Although the events of the present case lasted for a period of up to two hours, the facts do not indicate any demarcation between the time of the assault and the overall incident. In other words, under the record before us, we are unable to determine the amount of time in which the sexual assault and attempt to commit sexual assault occurred vis-à-vis the overall period of time of the incident.

[16] The placement of the victim in the window well also served to frighten and subdue her to prevent her from summoning assistance despite the fortunate and timely arrival of the third parties in this case. See *State* v. *Ward*, supra, 306 Conn. 736. It also made detection less likely. Id., 737.

[17] The victim testified that when the petitioner briefly left to fight with a third party, she tried to get out of the window well, but the depth impeded her departure and allowed the petitioner to throw her back down. Only following another altercation between the petitioner and the third party was

the victim able to get out of the window well. The petitioner, however, was able to quickly hunt her down and resume his felonious conduct.

———————————————————